**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| PEAK COMMUNICATIONS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. SA-24-CV-0352 |
| v. | § | |
| | § | |
| NORMAN M. PHIPPS and BSGL | § | JURY TRIAL DEMANDED |
| HOLDING, LLC, a Texas limited liability | § | |
| company, | § | |
| | § | |
| Defendants. | § | |

**<u>COMPLAINT</u>**

Plaintiff Peak Communications, Inc. ("Plaintiff" or "Peak"), by and through its undersigned counsel, hereby files this Complaint against Defendants Norman M. Phipps and BSGL Holding, LLC, and, in support thereof, alleges as follows:

**I. <u>PARTIES, JURISDICTION & VENUE</u>**

1.      Plaintiff, Peak Communications, Inc. ("Peak"), is a California corporation and a citizen of the state of California for the purposes of diversity jurisdiction.

2.      Defendant, Norman M. Phipps ("Phipps"), is a Texas resident who resides in the City of San Antonio.  At all times relevant herein, Phipps was the sole director, President, Chief Executive Officer, and Chief Financial Officer of Billing Concepts, Inc. ("BCI"). BCI is a dissolved Delaware corporation whose principal place of business (corporate headquarters) was in San Antonio, Texas prior to its dissolution.  BCI was registered as a foreign corporation authorized to do business in Texas.  Phipps is jointly and severally liable for all claims asserted in this action due to his status as an insider, officer, director, and managing agent of the entities referenced herein, the perpetrator of the wrongful conduct alleged herein, and as a direct or indirect recipient

of fraudulent transfers described herein.

3.     Defendant, BSGL Holdings, LLC ("BSGL"), is a terminated Texas Limited Liability Company whose registered office is 700 Louisiana, Suite 2650, Houston, Texas 77002. BSGL's registered agent is Brandon S. Winchester.  Phipps is the Manager of BSGL.  BSGL was formed on March 5, 2021 and terminated on July 14, 2022.   Peak is entitled to pursue the claims herein against BSGL under Tex. Bus. Orgs. Code Ann. § 11.356 permitting actions to be brought against a terminated entity within three years of termination.

4.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) over all claims in this action because (a) Peak is not a citizen of any State in which Phipps or BSGL is a citizen, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.

5.     This Court has personal jurisdiction over Phipps and BSGL, because they both were domiciled in Texas, did business in Texas, and/or purposefully availed themselves of the laws of the State of Texas.

6.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## II.  BACKGROUND

### A.    FACTUAL BACKGROUND.

7.     This dispute that gives rise to this action arose out of a contract between Peak and BCI entitled the *Invoice Ready Billing and Information Management Services Agreement* dated June 26, 2000 (the "Services Agreement").

8.     Peak is a regulated Interexchange Carrier ("IXC") who is authorized to provide long distance telephone service to residential and business customers. Peak provides presubscribed one-plus (1+) long distance phone services to customers in multiple states throughout the country.

9.      As an IXC, Peak is subject to regulation by the Federal Communications Commission ("FCC") and regulatory authorities in the states in which it provides long distance services.

10.      Peak does not possess the embedded infrastructure, networks, or billing platforms to provide long distance service.  Instead, it purchases and resells its telecommunications services, and is known as a "Reseller."

11.      BCI is a subsidiary of United States holding companies that are subsidiaries of Billing Services Group Limited ("BSG"), a Bermuda holding company. BSG's stock was traded on the London AIM Exchange in the United Kingdom.  BSG operated through several subsidiaries, including BCI, as shown on the following 2018 chart:



The parent and subsidiaries will be collectively referred to herein as the "BSG Entities."

12.     Phipps was

13.     a director, Chief Executive Officer, and Chief Financial Officer of BSG;

14.     the sole director, Chief Executive Officer, and Chief Financial Officer of Billing Services Group North America, Inc.;

15.     an "Officer" of BSG Clearing Solutions North America, LLC; and

16.     the sole director, Chief Executive Officer, and Chief Financial Officer of BCI.

17.     BCI provided the service of aggregating third-party telecommunications charges for purposes of facilitating billing for Peak and other Resellers.  Companies like BCI are referred to as "aggregators" or "clearinghouses" because they aggregate and provide billings services to a multitude of Resellers like Peak.

18.     In 2019, the Peak/BCI Services Agreement was not renewed and terminated.

19.     The underlying dispute arose because BCI failed to remit over $932,773.29 that was owed to Peak under the Services Agreement for three separate obligations:

| Claim Description | Accrual Date of Cause of Action | Principal Amount of Claim |
|---|---|---|
| Class Action Withholding | 2/7/2019 | $592,637.88 |
| Eight Percent (8%) Surcharge | 2/22/2019 | $80,174.91 |
| Unpaid Post-Termination Revenue | 12/31/2020 | $259,960.50 |
| **Total** | | **$932,773.29** |

(the "Claims").

20.     From at least February through August 2019, Peak sent letters, emails, and participated in phone calls with BCI, demanding accountings and the money it was owed for the Claims. BCI failed to account for and pay the Claims.

21.     In February 2019, BCI was sued by another Reseller in an action styled *Legent*

*Comm, LLC v. Billing Concepts, Inc.*, 5:19-CV-202 (W.D. Tex. San Antonio Division), seeking damages for excessive class action withholdings and the imposition of an improper eight percent surcharge, two of the same claims asserted by Peak.  The Legent Comm claims were estimated to exceed $2 million.  (*See*, Dkt. No. 53, Response to Motion for Summary Judgment.)  The Legent Comm action settled in January 2021. (*See*, Dkt. No. 85.)

22.     BCI's failure to account for and remit excessive class action withholdings was systemic and impacted many other Resellers who obtained third-party billing services from BCI.

### 1.     BSG's Involvement With Enhanced Service Providers.

23.     In addition to providing LEC Billing services to long distance Resellers, BSG provided LEC Billing services through BCI's sister subsidiaries to companies that provided unregulated services.

24.     The unregulated services are commonly known in the industry as "Enhanced Services."  Enhanced Services are products or services unrelated to the completion of a telephone call; they can include services such as website hosting, directory listings, e-mail, voicemail, and streaming video services.

25.     Enhanced Service Providers typically market services directly to consumers, often through internet advertising. If the consumers sign up for the offered service, the consumers ostensibly agree to be charged for the services on their local telephone bill.  Due to apparent lax oversight, enhanced services billing has a history of problems ranging from inaccurate billing to outright fraud.

26.     The BSG Entities have long history of problems from dealing with Enhanced Service Providers who engaged in the unlawful practice known as "cramming."

27.     Cramming is the practice of placing unauthorized charges on a customer's phone

bill without a customer's consent or due to the consent having been obtained through deceptive or fraudulent means.

28.     Cramming violations are enforced by the Federal Communications Commission ("FCC"), the Federal Trade Commission ("FTC"), and state public utility commissions.

### 2.     The AT&T and Verizon Class Actions.

29.     In April 2009, two class action lawsuits were commenced against AT&T and Verizon for cramming that was perpetrated by Enhanced Service Providers who used BSG and other aggregators to put the charges on end-user customer's phone bills, (the "Class Actions").

30.     Neither Peak nor any of the Resellers were parties to the Class Actions.

31.     According to the settlement agreement in the AT&T class action, the "vast majority" of the cramming claims stemmed from unauthorized charges for "enhanced services" appearing on AT&T customers' bills. AT&T eliminated third-party billing for "enhanced services" as of September 12, 2012 to put an end to the practice.

32.     According to the Court's Order granting final approval of the settlement in the Verizon class action, the billing for "miscellaneous or enhanced services" were the "services that have generated the bulk of the cramming complaints." Verizon eliminated third-party billing for enhanced services as of December 31, 2012.

33.     BSG's 2011 Annual Report similarly observed that sales and billing for "enhanced services" precipitated the commencement of the Class Actions and related regulatory exposure:

> In 2010, as the result of consumer complaints and class action litigation against LECs, the largest LEC in the United States added new restrictions on third party billing for enhanced services. The restrictions resulted in a substantial reduction in the volume of transactions billed through the Company. In December 2010, the federal government announced an investigation into alleged "cramming" (inclusion of unauthorized charges) by some participants in the telecommunications industry, including third

party billers. Substantially all of the issues identified by the LECs and the federal government involve charges for enhanced services.

As expected, the audit reached a successful conclusion. Unfortunately, the successful audit did not translate to a resumption of normal billing for enhanced services. Instead, the three largest LECs have informed the Company that they will cease accepting third party charges for enhanced services during the course of 2012.

With respect to the Congressional investigation announced 18 months ago, BSG has not received any communication from the investigating body. The Company did receive notice, however, that the Federal Trade Commission ("FTC") has initiated an action against the Company for alleged violation of a 1999 settlement agreement with a subsidiary, as previously announced. The Company believes there is no merit in the FTC's allegations and intends to vigorously defend itself.

(Billing Services Group Limited Annual Report for the year ended December 31, 2011).

34.     When AT&T and Verizon eliminated third-party billing for Enhanced Service Providers, the revenue pipeline for the Enhanced Service Providers quickly dried up, leaving the BSG Entities facing an enormous indemnity obligation to AT&T and Verizon for the Class Action claims, attorneys' fees, and expenses attributable to the Enhanced Service Providers.

35.     Beginning in late 2011 (in the case of AT&T) and 2012 (in the case of Verizon), the LECs proactively began withholding funds from revenue streams generated from the BSG Entities to secure the BSG Entities' indemnity obligations to the LECs.

36.     The BSG Entities (including BCI) invoked the protections afforded by the Services Agreements and withheld funds from Peak and other Resellers to cover BSG's indemnity obligations arising from the Class Actions.

37.     The BSG Entities eventually sued the Enhanced Service Providers in multiple lawsuits. One such lawsuit was commenced in 2017, styled *BSG Clearing Solutions North America, LLC v. Voiceexpress, Inc.*, Civ. No. 5:17-cv-780 (DAE) (W.D. Tex.) in which BSG sued a host of Enhanced Service Providers, alleging, inter alia, breach of contract, violation of the

Racketeer Influenced and Corrupt Organizations ("RICO") Act, and alter ego resulting from the Enhanced Services Provider's rampant fraud.

38.     The *Voiceexpress* Complaint alleged that BSG's indemnity obligation to the LECs resulting from the fraud was $38.5 million. (Complaint, ¶ 4 at p. 2, Docket No. 1.)  BSG alleged that the Enhanced Service Provider's fraudulent practices precipitated the Class Actions and exposed BSG to a massive indemnity obligation:

> Cramming—the process of tacking unauthorized charges onto a consumer's phone bill—costs Americans over $2 billion each year. The defendants [enhanced billers] in the case are at the center of a vast scheme that has defrauded consumers out of hundreds of million dollars. The defendants have fraudulently charged consumers for phone-based services which were either not authorized, not provided, or both. They then submitted these fraudulent charges to BSG, ESBI, and ACI for processing. BSG, ESBI, and ACI are agents who process and manage the billing for the country's largest phone companies (called local exchange carriers or "LECs").
>
> Once this fraud was discovered, a chain reaction took place: consumers filed multiple class actions against the LECs who sought indemnity, pursuant to their contractual arrangements, from BSG, ESBI, and ACI. Now, BSG, ESBI, and ACI seek indemnity and other damages from the individuals who manipulated corporate shams to defraud Americans out of millions of dollars.

*Id*. at ¶¶ 1-2.

39.     Although the Class Action settlements mainly involved claims pertaining to the cramming of enhanced services, both settlements provided for the dissemination of broad class notices to AT&T and Verizon customers and permitted the submission of claims for traditional telecommunications services, including long distance services provided by Peak and other Resellers.

40.     For example, one of the notices to the class in the AT&T class action provided in part:

If you were billed for Third-Party Charges on your AT&T landline telephone bill and you did not authorize the charges, you may be entitled to a payment from this class action settlement.

41.     The notice to the class in the Verizon class action provided in part:

CLASS ACTION SETTLEMENT NOTICE . . . You Received This Notice Because Verizon's Records Indicate You Were Billed For Third Party Charges between April 27, 2005 and February 28, 2012 and May Be Entitled to a Payment From This Class Action Settlement.

42.     The class notice in the AT&T case was disseminated to 23 million AT&T customers and more than 16 million claims were filed as of November 2013.

43.     Likely due to the broadly worded and widely disseminated class notices, class members submitted claims against Peak and other Resellers.

44.     The claims process in the AT&T and Verizon class actions differed in that claims asserted against legitimate billings of long distance Resellers like Peak had a greater ability to challenge claims in the AT&T class action than in the Verizon class action. Specifically, the AT&T claims process allowed the submission of proof that sales were legitimate as compared to the Verizon case.

45.     BSG has only sued Enhanced Service Providers and did not sue Peak or other Resellers.

46.     Unlike the Enhanced Service Providers, Peak and the other Resellers are legitimate long distance resellers, most of which have been operating since 2001, and employ strict controls to prevent cramming in the sales of their regulated long distance services.

47.     The AT&T class action received preliminary approval of the class action settlement in early 2013 and final approval on November 27, 2013.

48.     The Verizon class action received preliminary approval of the class action settlement in 2012 and final approval on August 28, 2013.

49.     Both settlements provided for injunctive relief to change offending practices, refunds/payments to customers who submitted valid claims, and attorneys' fees.

50.     The administration of the settlements took years to complete and, according to BSG, was still ongoing as of September 21, 2018.

### 3.     FTC Enforcement Actions Against BCI and The Other BSG Entities.

51.     While the BSG Entities attempt to portray themselves as victims of the Enhanced Service Providers in the lawsuits they brought against the providers, the BSG Entities themselves were sued by the FTC for facilitating cramming and profiting handsomely from the unlawful practice.

52.     One such action was brought in 1998 styled *FTC v. Hold Billing Services*, 5:98-CV-00629-FB (W.D. Tex.). The case concluded in 1999 with some of the BSG Entities stipulating to the entry of a permanent injunction prohibiting them from engaging in cramming and other deceptive LEC Billing practices.  (Hereinafter referred to as the "1999 FTC Injunction").

53.     On April 4, 2012, the FTC filed a motion to hold the BSG Entities (including BCI) in contempt for violating the 1999 FTC Injunction for "putting more than $70 million in bogus charges on consumers' phone bills for 'enhanced services,' such as voicemail and streaming video, that consumers never authorized or even knew about."

54.     The FTC's Contempt Motion was filed solely to remedy the BSG Entities' conduct relating to the cramming of "enhanced services" and did not involve or relate to Peak or other Resellers.

55.     On April 4, 2014, following a ten-day evidentiary hearing, Magistrate Judge Bemporad issued a lengthy Report and Recommendation that recommended the FTC's request for a finding of contempt be granted, in part.

56.    The Magistrate Judge found in part that ESBI (one of BSG's subsidiaries),

> clearly should have known that, due either to willful fraud or gross negligence, the Landeen voicemail service providers were submitting bills for unauthorized accounts, but for months it took no action to protect telephone customers from this hazard.

(R&R at p. 25, n.27, Docket No. 232.)

57.    On May 19, 2016, the BSG Entities settled the contempt proceeding by entering into a Stipulated Order for Permanent Injunction and Monetary Judgment that superseded the 1999 Injunction and additionally required BSG to pay $5.2 million to the FTC ("2016 FTC Order").

58.    The 2016 FTC Order contains several important findings and orders, including:

a.    BCI, as one of the "BSG Entities" in the contempt proceeding, is bound by the 1999 FTC Injunction.

b.    All of the BSG Entities were in civil contempt for violating Section III of the 1999 FTC Injunction.

c.    A joint and several $5.2 million judgment was entered against all of the BSG Entities to cover "consumer redress."

d.    "The facts alleged in the Motion to Show Cause will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case."

e.    "The facts alleged in the motion to show cause establish all elements necessary to sustain an action by the commission pursuant to section 523(a)(2)(a) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(a), and this order will have collateral estoppel effect for such purposes."

f.    Section 523(a)(2)(a) of the Bankruptcy Code provides for the nondischargeability of obligations that arise from obtaining money, property, services, or credit by "false pretenses, a false representation, or actual fraud."

**4.    Class Action Holdbacks.**

59.    As noted above, pursuant to rights afforded to BCI under the Services Agreement,

beginning in 2011 in the case of AT&T, and 2012 in the case of Verizon, money was withheld from Peak and other Resellers to pay for and/or secure the BSG Entities' indemnity obligations to the LECs.

60. BCI advised Peak that the AT&T and Verizon, and the BSG Entities similarly withheld money from other Resellers, the Enhanced Service Providers, and other customers who utilized the BSG Entities' LEC Billing services. BSG's public financial statements confirm that tens of millions of dollars were withheld as reserves to fund the BSG Entities' Class Action indemnity obligations to AT&T and Verizon.

> 5. **BCI Breached the Services Agreement by Failing to Provide An Adequate Accounting and Refunding Peak the Money It Was Owed For the Class Action Holdbacks.**

61. The Services Agreement requires BCI to account for and pay Peak when amounts withheld are determinable and can be allocated to Peak.

62. BCI's general counsel acknowledged that the Services Agreement and the decision in *Better Benefits Organization, Inc. v. BSG Clearing Solutions North America, LLC*, Civ. No. 5:14-CV-00242-JWP, 2016 WL 7486366 (W.D. Tex. Feb. 4, 2016) required BCI to only assess Peak and other Resellers for their "proportionate and equitable" share of the Class Action obligations.

63. According to the Affidavit, the Class Action claims administration process was still ongoing as of September 18, 2018.

64. In October 2018, Peak's principal, Jake Hulse, followed up on prior demands for an accounting of the Class Action holdbacks and sent requests over the ensuing years. None of BCI's responses complied with its obligations to account for and return excess withholdings to Peak.

65.     On August 24, 2020, Phipps sent an email to Peak asserting that no money was owed to Peak from the Class Action holdbacks. But BCI had improperly withheld $592,637.88 from Peak that was due as early as June 2019.

66.     The Services Agreement, common law, and the *Better Benefits* decision required BCI to fully account for and pay Peak $592,637.88.

67.     BCI breached the Services Agreement beginning in 2019 by, inter alia, failing to (a) properly account for the Class Action holdbacks, (b) remit funds to Peak that were withheld in excess of Peak's allocable share of the Class Action holdbacks, and/or (c) comply with the requirements of the Services Agreement, common law, and the *Better Benefits* decision.

**6.     BCI Breached the Services Agreement by Wrongfully Imposing An Extra-Contractual Rate Increase.**

68.     The Services Agreement set the rates charged for processing fees that BCI provided to Peak. The processing fees were calculated based on the number of billing records submitted from Peak to BCI for processing.

69.     In the winter of 2017, Phipps mentioned to Jacob Hulse, (Peak's President), that BCI was thinking about a potential rate increase. Hulse responded by telling Phipps that if they decide to move forward with an increase, to send a contract for Peak's consideration.

70.     Unbeknownst to Peak, BCI unilaterally implemented the surcharge on December 2017 records without notifying Peak or obtaining Peak's verbal or written consent to the surcharge.

71.      Section 22 of the Services Agreement provides that modifications, amendments, waivers, or consents are only effective if they appear in a writing signed by or on behalf of the party against whom such modification, amendment, waiver or consent is claimed.

72.     In February 2019, BCI sent a proposed amendment to the Services Agreement that included an eight percent surcharge.  Peak did not sign the amendment and on February 22, 2019,

Hulse explicitly objected to the rate increase in writing.

73.     To make matters worse, BCI imposed the surcharge on gross billings, which was an increase greater than 100% in the processing fees charged to Peak.  These charges were first imposed on Peak's January 2018 billing submissions and continued until the Services Agreement was terminated on June 30, 2019.

74.     Peak was not aware a rate increase had been imposed until February 2019 and promptly protested in writing.

75.     BCI ignored the requests for further discussions, ignored the request to reinstate the contractual rates, and did not refund the overcharges.

76.     Because BCI deducted its fees from Peak's revenue stream, Peak had no ability to reject or "not pay" the unauthorized rate increase.

77.     Peak was entitled to an accounting and a refund of the overcharges.

78.     Peak determined the overcharges totaled $80,174.91.

**7.     BCI Breached the Services Agreement by Failing to Return and Account for Peak's Post-Termination Revenue.**

79.     Effective June 30, 2019, Peak properly terminated the Services Agreement and moved its customers to an in-house billing platform.

80.     Pursuant to Section 13 of the Services Agreement, BCI was permitted to withholding revenue for up to 18-months following the termination of the Services Agreement and was obligated to perform a full and final accounting to true-up any monies owed to or from Peak.

81.     Despite BCI owing Peak at least $259,961 and Peak demanding payment, BCI failed to provide a final accounting and failed to remit the post-termination money to Peak.

82.     BCI breached the Services Agreement entitling Peak to an accounting and payment of the post-termination money owed to Peak.

83. Despite notice and multiple demands from Peak, BCI was aware of and did not pay Peak for the Class Action holdback, eight percent surcharge, or post termination revenue Claims.

**B.    PROCEDURAL BACKGROUND.**

      **1.    The Arbitration.**

84. On September 20, 2022, Peak initiated arbitration under Section 26(c) of the Services Agreement, asserting a breach of contract claim and an accounting claim against BCI.

85. A final arbitration hearing took place before a panel of three arbitrators on January 26, 2023. Peak presented witnesses who offered sworn testimony and all exhibits offered at the hearing were admitted.

86. On January 30, 2023, a post-hearing application for attorneys' fees and costs was filed with the AAA by Peak's counsel.

87. On February 22, 2023, the arbitrators issued a Final Award in favor of Peak, awarding Peak $932,773.29 in actual damages, plus attorneys' fees, expenses, pre- and post-award interest, and costs as follows:

| | |
|---|---:|
| Principal Amount of Compensatory Damages | $932,773.29 |
| Prejudgment (Pre-award) Interest | $240,458.89 |
| Attorneys' fees and costs | $60,482.66 |
| AAA administrative fees | $12,325.00 |
| Arbitrator compensation and expenses | $23,306.41 |
| **Total Award** | **$1,269,346.25** |

88. The Panel also awarded post-award interest at the rate of 7.5% per annum compounded annually from February 22, 2023 (the date of the award).

89. The Arbitration demand, claims, and hearing submissions were all served on BCI through its registered agent, courtesy copies were provided to Phipps by U.S. Mail and email. But Phipps and BCI failed to appear and defend.

      2.        **Confirmation of the Arbitration Award and Judgment.**

90.     On March 16, 2023, Peak filed an Application to Confirm Arbitration Award in this Court in an action styled *Peak Communications, Inc. v. Billing Concepts, Inc.* 5:23-CV-328 (W.D. Tex. San Antonio Division).  Hereinafter, the "Underlying Action."

91.     Despite due notice, BCI did not appear or oppose the confirmation proceedings.

92.     On June 8, 2023, the Court confirmed the arbitration award (Dkt. No. 10) and entered judgment on the arbitration award.  (Dkt. No. 11).

**C.      THE DISSOLUTION OF BCI.**

93.     As noted above, BCI was a Delaware corporation.

94.     On June 14, 2021, Phipps filed a Certificate of Dissolution with the Delaware Secretary of State on behalf of BCI.  It was signed by Phipps as the sole officer and director of BCI.

95.     On July 19, 2021, Phipps filed a Certificate of Dissolution with the Delaware Secretary of State on behalf of Billing Services Group North America, Inc. (BCI's United States parent corporation). The Certificate of Dissolution likewise identified Phipps as the sole officer and director.

96.     On March 25, 2022, Phipps filed a Certificate of Cancellation on behalf of BSG Clearing Solutions North America, LLC, whose sole member was Billing Services Group North America, Inc.  Phipps signed as an "officer" of Billing Services Group North America, Inc.

97.     8 Del. Code § 281(b) provides:

> A dissolved corporation or successor entity which has not followed the procedures described in § 280 of this title shall, prior to the expiration of the period described in § 278 of this title, adopt a plan of distribution pursuant to which the dissolved corporation or successor entity (i) shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured contractual claims

known to the corporation or such successor entity, (ii) shall make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding to which the corporation is a party and (iii) shall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 10 years after the date of dissolution. The plan of distribution shall provide that such claims shall be paid in full and any such provision for payment made shall be made in full if there are sufficient assets. If there are insufficient assets, such plan shall provide that such claims and obligations shall be paid or provided for according to their priority and, among claims of equal priority, ratably to the extent of assets legally available therefor. Any remaining assets shall be distributed to the stockholders of the dissolved corporation.

98.     BCI did not provide a notice to Peak pursuant to 8 Del. Code § 280, so it was required to comply with Section 281(b) and reserve money for Peak and the other Resellers that are owed millions of dollars in refunds from the Class Action holdbacks alone.  Based upon Peak's post-judgment discovery, there is no indication that BCI complied with the requirements of Section 281(b).

## D.     PEAK'S INITIAL POST-JUDGMENT DISCOVERY UNCOVERS UNLAWFUL DIVIDENDS AND FRAUDULENT TRANSFERS.

### 1.     Peak's Preliminary Post-Judgment Discovery.

99.     In July 2023, Peak commenced post-judgement discovery by serving a third-party subpoena on Weaver and Tidwell, LLP ("Weaver"), the accounting firm that provided accounting services to BSG and its subsidiaries.  Weaver objected to producing information until and unless there was a court order requiring it to respond.

100.    On October 23, 2023, Peak filed a motion to compel enforcement of the subpoena.

101.    On November 20, 2023, the Court granted the motion.

102.    Weaver first produced documents on December 18, 2023 and January 18, 2024.

103.    On March 15, 2024, Peak served a supplemental subpoena to obtain additional documents.  Weaver produced documents in response to the supplemental subpoena on March 29, 2024.

104.    Peak also served several subpoenas on BCI's banks identified in the financial records produced by Weaver.

105.    Prior to receiving the responses to the Weaver subpoenas, only the public financial reports were available for the parent company, BSG.  Those reports did not breakout the financial information for the United States subsidiaries.

### 2.    BSG Distributed $2.5 Million in Dividends to Its Public Shareholders in 2018 and 2019, Despite its Lack of Profitability.

106.    Due to the loss of clearinghouse business with AT&T, Verizon, and other LECs resulting from BSG's dealing with the unscrupulous Enhanced Service Providers, BSG's operating revenue plummeted from $96.8 million in 2011 to $16.1 million in 2018, according to its public financial statements.  The records for BCI obtained from Weaver similarly show a dramatic decline in BCI's revenue and profits continuing from 2019 until it dissolved in June 2021.

107.    BSG suffered a net loss of $7.8 million in 2018, yet in July 2018 it distributed $1.2 million in cash dividends to its shareholders.

108.    For the six months ended June 30, 2019, BSG's net income was zero, yet on April 30, 2019, it distributed $1.3 million in cash dividends to its shareholders.

109.    BCI's internal financial records provided by Weaver indicate at least some of the forgoing dividends were originally recorded in BCI's records.

### 3.    BSG Announces Plans to Delist from the AIM Stock Exchange and Explore Options to Exit the Clearinghouse Business.

110.    BSG had three main businesses: The (a) "Wireline Business" (operated by BCI);

(b) the "TPV Business;" and (c) the "Wireless Business." The TPV and Wireless Businesses were operated by BSG subsidiaries that are not involved in this case.

111.     In January 2020, BSG announced that it had a buyer for its "Wireless Business" and had made the decision to try to sell or liquidate the remaining businesses because they were unprofitable, and the outlook was deteriorating:

> In 2017, the Company initiated a strategic review to assist the Board in determining the future composition of the Group, including its capital structure and business lines. The primary objective of the review was to maximise shareholder value in light of divergent trends in the Wireline Business and the Wireless Business. The Wireline Business has experienced a sustained secular decline in transaction volume and revenues as a result of declining usage of wireline telecommunications and cessation of third-party billing by the largest LECs. In contrast, the Wireless Business has experienced modest gains in revenue and new clients.

> ****

> In 2019, following a renewed competitive process to sell the Wireless Business, Single Digits, Inc, the parent company of the Buyer, expressed interest in purchasing the Wireless Business.
> ****
> If the sale of BSG Wireless is completed, BSG will operate two business lines: the Wireline Business and the TPV Business.

> In light of the secular revenue decline in the Wireline Business, discussed in paragraph 3 above, and the absence of any likelihood of a favourable change in trends, the Company will continue to assess strategic options for the Wireline Business. The Wireline Business is currently generating a modest level of EBITDA, but further declines in revenue will adversely affect profitability. The Company will endeavour to undertake necessary expense reductions as appropriate, but it has become increasingly difficult to reduce expenses without jeopardising the reliability of services. If the Company is unable to generate earnings or find a buyer on reasonable terms for the Wireline Business, it will consider the other options available at that time.

> ****

> Revenue within the Wireline Business is expected to continue to decline. There is some potential for the TPV Business to experience increases in revenue, particularly if it is able to increase market share. However, the

> potential for added market share is limited by the highly competitive
> nature of the TPV industry.

(January 31, 2020 Proposed Disposal of BSG Wireless Business and Notice of Special General

Meeting, Appendix II.)

112.　On March 30, 2020, following the successful sale of its Wireless Business, BSG

gave notice that it proposed delisting from the AIM stock exchange and expected to wind down or

sell its remaining businesses.

113.　Nonetheless, BSG planned to issue its public shareholders a special cash dividend

of not less than $4.8 million from the proceeds of the sale of the Wireless Business.

114.　The announcement made it clear that BSG's core "Wireline Business" (BCI's

clearinghouse business) was essentially on its death bed and disclosed that the value of its common

stock "may be adversely affected" by delisting the shares from the AIM stock exchange:

> The economic impact of the on-going COVID-19 pandemic has made the
> possibility of realising value for the two remaining businesses more
> difficult; however, the Company will continue to explore any and all
> strategic options in relation to them. The Company will keep Shareholders
> apprised of any developments on these fronts, both before and after the
> proposed Cancellation.
>
> ****
>
> It is possible that following publication of this document, the liquidity and
> marketability of the Common Shares and interests in Common Shares may
> be significantly reduced and the value of such Common Shares and
> interests in Common Shares may be adversely affected as a consequence.

(March 20, 2020 Notice of Sanctioned 2019 Annual General Meeting at p. 5.)

115.　On April 30, 2020, BSG announced that "all resolutions, including the special

resolution to approve the proposed cancellation of the admission of the Company's Ordinary

Shares to trading on AIM ('Cancellation'), were duly passed" and "the last day of dealings in the

Company's Ordinary Shares on AIM will be Thursday 7 May 2020 . . ."

116.    As of June 6, 2020, Phipps owned 6.46 percent of BSG's shares, according to the "Significant Shareholder Ownership" disclosure on BSG's then-website.

117.    Upon information and belief, BSG issued a $4.8 million special cash dividend to its public shareholders on April 30, 2020.

118.    Upon information and belief, Phipps and/or his affiliates were direct recipients of the dividends paid by BSG in 2018, 2019, and 2020.

119.    Upon information and belief, BSG may have thereafter made additional liquidating distributions to its shareholders.

120.    BCI's internal financial records provided by Weaver indicate that all or some of the forgoing dividends were originally issued by BCI.

121.    All of the dividends issued in 2018, 2019, 2020, and thereafter, were unlawful under 8 Del. Code §§ 170-174, and applicable United Kingdom and Bermuda law.  Phipps, BCI, BSG, and their respective directors willfully or negligently approved the dividend distributions when BCI and BSG lacked sufficient surplus or net profits, were insolvent, and/or were otherwise rendered insolvent by the payment of the dividends.

### 4.    BCI Sells its Clearinghouse Business in July 2020.

122.    In July 2020, BCI sold its clearinghouse business to viiz Billing Services, LLC ("viiz"), which was BCI's only source of operating revenue.

123.    Peak does not yet have access to documents to show how much, if any, cash BCI received from viiz for the sale. But internal records and tax returns recently produced by Weaver claim the sale generated a loss greater than $2 million.

124.    Phipps later became the President and CEO of viiz.

### 5.    From July 2020 to December 2020, BCI Wrote Off a $16.4 Million Intercompany Receivable Owed by BSG.

125.    The internal financial records produced by Weaver show that as of January 2020, BSG owed BCI $16.4 million, which was carried as an asset on BCI's balance sheets as an "intercompany receivable."

126.    From July to December 2020, BCI *wrote off the entire $16.4 million intercompany receivable*. Peak has been unable to identify anything of equivalent value received by BCI in exchange for writing off the receivable and relieving BSG of its obligation to repay BCI.

### 6.    Phipps's Officer Compensation Was Excessive and Unreasonable.

127.    In 2018 and 2019, Phipps's "officer compensation" was $548,000 per year, according to documents produced by Weaver.

128.    Given that BCI was losing money, and its business was rapidly deteriorating in 2018 through 2019, Phipps's $548,000 compensation was excessive.

129.    In 2020, Phipps's officer compensation was inexplicably *increased* to $1 million.

130.    Since BCI only operated for six months in 2020 before selling its business to viiz, Phipps's compensation should have been *reduced* from the $548,000 he was paid in 2018 and 2019.

131.    Phipps's 2020 compensation was excessive, unreasonable, and bore no relation to the reasonable value of his services.

132.    Phipps's excessive compensation continued into 2021.

133.    BCI was dissolved on June 14, 2021 by Phipps and had no operating income before it was dissolved.  Yet, Phipps's compensation was $259,000.

134.    Phipps's 2021 compensation was excessive, unreasonable, and bore no relation to the reasonable value of his services.

135.    Instead of reserving money to satisfy creditor claims when BCI was insolvent and

winding down, Phipps breached his fiduciary and statutory duties to creditors by knowingly siphoning cash out of BCI in the form of excessive compensation.

### 7.    BCI Incurred Excessive and Unreasonable "Nondeductible" Business Expenses in 2020 and 2021.

136.    There are additional excessive and unreasonable expenses on BCI's books and tax returns that likely benefited Phipps and his colleagues.

137.    The 2020 tax return indicates BCI's "airfare" expense was $64,812.

138.    In 2020 and 2021, BCI booked the following amounts as "Nondeductible Expenses:"

| Account | Description | 1st PP-CONSOL 12/31/2020 | PRE-CONSOL 6/30/2021 | Parent 6/30/2021 | BCI 6/30/2021 |
|---|---|---|---|---|---|
| Subgroup : [.18] | Nondeductible Expenses | | | | |
| 670004 | GEN OFFICE SUPPLIES-NONDEDUCT | 146,741.27 | 249,114.45 | 0.00 | 249,114.45 |
| 730017 | AIRFARE NONDEDUCTIBLE | 20,670.24 | 25,201.29 | 0.00 | 25,201.29 |
| 730018 | LODGING NONDEDUCTIBLE | 55,933.81 | 154,147.25 | 0.00 | 154,147.25 |
| 730019 | MEALS NONDEDUCTIBLE | 20,197.60 | 72,432.12 | 0.00 | 72,432.12 |
| 730020 | AUTO & MISC NONDEDUCTIBLE | 19,645.32 | 27,286.25 | 0.00 | 27,286.25 |
| 834000 | TAX PENALTIES | 23.51 | 5,717.40 | 0.00 | 5,717.40 |
| Subtotal [.18] | Nondeductible Expenses | 263,211.75 | 533,898.76 | 0.00 | 533,898.76 |

139.    (Consolidated Trial Balance – Book Combined Detail Classified LS December 31, 2020 to June 30, 2021).

140.    The forgoing expenses are excessive, unreasonable, and unjustifiable for a company that had no business operations after selling its clearinghouse business in July 2020.

### 8.    On March 11, 2021, BCI Transferred $702,500 to a Newly Formed Shell Company Managed by Phipps.

141.    On March 5, 2021, Defendant BSGL was formed as a Texas limited liability company.

142.    Phipps is identified as the "Manager" of BSGL.

143.    The only addresses associated with BSGL are the addresses for an attorney who was the registered agent and Phipps's home address.

144.    The company does not have a website, telephone number listings, a business

address, nor any apparent business activities.

145.    On July 14, 2022, Phipps signed a Certificate of Termination and BSGL was terminated.

146.    BSGL appears to be nothing more than a shell company that was controlled by Phipps.

147.    BSGL does not appear to be an affiliate or a subsidiary of BSG or its subsidiaries.

148.    In 2020 and 2021, BCI had dozens of bank accounts with at least four different banks, including Spirit of Texas Bank.

149.    Plaintiff has served subpoenas on three of the banks, but has so far only received responsive documents from Spirit of Texas Bank.

150.    On March 11, 2021, just six days after BSGL was formed, $702,500 was wired from Spirit of Texas Bank to BSGL Holdings, LLC's bank account to "Fund LLC Entity" as shown in the following screenshot:

```
Date      Description                          Amount
3/11      Netteller Wire Transfer Debit        702,500.00-
          BSGL Holdings LLC
          026009593
          7411 John Smith
          Suite 510
          BK AMER NYC
          NEW YORK, NY
          Fund LLC Entity
```

(Spirit of Texas Bank, March 31, 2021 Statement obtained by Peak on March 29, 2024).

151.    In August 2021, when Weaver was gathering information to prepare the final tax return for BCI's parent, a Weaver accountant asked Yvette Patino (BCI's liaison to the accounting firm) for an explanation of the "$702k cash transfer."  Ms. Patino's initial response was as follows:

> Attached are the GL detail files for the accounts requested.  The write off amounts either pertain to customer balances or Intercompany balances.  For account 985099, I do not have a description for the $702k cash transfer.  This was requested by Norm and I was only told it was being transferred to another bank account.  Please let me know if I need to press Norm for further details.
>
> Thanks,
>
> Yvette

(August 30, 2021 Email from Patino to Weaver.)

152.    On September 20, 2021, following some reminders from Weaver, Patino responded as follows:

> Hi Alena.  I just received an email from Norm.  The $702k should be treated as a write off of the intercompany balance.
>
> Let me know if you have any other questions.
>
> Thanks,
>
> Yvette

(September 20, 2021 Email from Patino to Weaver, highlighting in original).

153.    Patino's email demonstrates that BCI did not receive anything of value in exchange for the $702,500 transferred to BSGL; that Phipps was directly responsible for the transfer; the cash was fraudulently siphoned out of BCI to the detriment of its creditors; and the cash most likely benefited Phipps.

### III. CLAIMS FOR RELIEF

### COUNT 1
**(Actual Fraudulent Transfers In Violation Of Tex. Bus. & Com. Code § 24.005)**

154.    Peak restates and realleges the allegations set forth in preceding paragraphs above, as if fully set forth herein.

155.    At all times relevant herein, Peak was a creditor of BCI within the meaning of the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.001, *et seq*. ("TUFTA").

156.    At all times relevant herein, BCI was a debtor, within the meaning of TUFTA.

157.    At all times relevant herein, Phipps, BSG, and BSG's United States subsidiaries are affiliates and insiders of BCI, within the meaning of TUFTA.

158.    BCI made transfers to insiders and affiliates, including, without limitation, Phipps, BSGL, and shareholders, after Peak's claim arose, with the actual intent to hinder, delay, or defraud Peak and other creditors of BCI, in violation of Section 24.005(a)(1) of TUFTA.

159.    The transfers, include, without limitation:

a.  the 2018, 2019, and 2020 dividends issued by BCI and/or BSG;

b.  the $16.4 million write off of BCI's intercompany receivable;

c.  excessive and unreasonable officer compensation paid to Phipps;

d.  excessive and unreasonable expenses that benefited Phipps and other insiders of BCI;

e.  the $702,500 wire transfer to BSGL for the benefit of BSGL and Phipps; and

f.  other transfers that are identified in response to Peak's post-judgment discovery in the underlying action against BCI and in discovery in this action.

160.    The forgoing facts demonstrate that the following factors (colloquially known as "badges of fraud") are present in this action and establish actual intent within the meaning of Section 24.005(a)(1) of TUFTA: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; and/or (9) the debtor was insolvent or became insolvent

shortly after the transfer was made or the obligation was incurred.

> Peak commenced this action within one year after the transfer or obligation was or could reasonably have been discovered by Peak. The information necessary to discover the forgoing transfers was concealed and unavailable to Peak until it conducted post-judgment discovery in the Underlying Action.

161.    As a direct result of Defendants' violation of TUFTA, Peak has been damaged in the principal amount of $1,269,346.25, plus post-award interest at the rate of 7.5% per annum compounded annually from February 22, 2023, plus costs and attorneys' fees as provided by law.

162.    Peak is entitled to all relief available under Section 24.008 of TUFTA.

## COUNT 2
**(Constructive Fraudulent Transfers in Violation of Tex. Bus. & Com. Code § 24.005)**

163.    Peak restates and realleges the allegations set forth in preceding paragraphs above, as if fully set forth herein.

164.    At all times relevant herein, Peak was and has been a creditor of BCI, within the meaning of TUFTA.

165.    At all times relevant herein, BCI was a debtor, within the meaning of TUFTA.

166.    At all times relevant herein, Phipps, BSG and its United States subsidiaries are affiliates and insiders of BCI, within the meaning of TUFTA.

167.    BCI made transfers to insiders and affiliates, including, without limitation, Phipps, BSGL, and shareholders, after Peak's claim arose, within the meaning of Section 24.005(a)(2) of TUFTA without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

168.    The transfers, include, without limitation:

    a.  the April 30, 2020 dividends issued by BCI and/or BSG;

    b.  the $16.4 million write off of BCI's intercompany receivable;

    c.  excessive and unreasonable officer compensation paid to Phipps;

    d.  excessive and unreasonable expenses that benefited Phipps and other insiders of BCI;

    e.  the $702,500 wire transfer to BSGL for the benefit of BSGL and Phipps; and

    f.  other transfers that are identified in response to Peak's post-judgment discovery in the underlying action against BCI and in discovery in this action.

169.    As a direct result of Defendants' violation of TUFTA, Peak has been damaged in the principal amount of $1,269,346.25, plus post-award interest at the rate of 7.5% per annum compounded annually from February 22, 2023, plus costs and attorneys' fees as provided by law.

170.    Peak is entitled to all relief available under Section 24.008 of TUFTA.

**COUNT 3**
**(Actual Fraudulent Transfers in Violation of 6 Del. Code § 1304)**

171.    Peak restates and realleges the allegations set forth in preceding paragraphs above, as if fully set forth herein.

172.    At all times relevant herein, Peak was and has been a creditor of BCI, within the meaning of the Delaware Uniform Fraudulent Transfer Act, 6 Del. Code § 1301, *et seq.* ("DUFTA")

173.    At all times relevant herein, BCI was a debtor, within the meaning of DUFTA.

174.    At all times relevant herein, Phipps, BSG and its United States subsidiaries are affiliates and insiders of BCI, within the meaning of DUFTA.

175.    BCI made transfers to insiders and affiliates, including, without limitation, Phipps,

BSGL, and shareholders, after Peak's claim arose, with the actual intent to hinder, delay, or defraud Peak and other creditors of BCI, in violation of Section 1301(a)(1) of DUFTA.

176.    The transfers, include, without limitation:

    a.    the 2018, 2019, and 2020 dividends issued by BCI and/or BSG;

    b.    the $16.4 million write off of BCI's intercompany receivable;

    c.    excessive and unreasonable officer compensation paid to Phipps;

    d.    excessive and unreasonable expenses that benefited Phipps and other insiders of BCI;

    e.    the $702,500 wire transfer to BSGL for the benefit of BSGL and Phipps; and

    f.    other transfers that are identified in response to Peak's post-judgment discovery in the underlying action against BCI and in discovery in this action.

177.    The forgoing facts demonstrate that the following factors (colloquially known as "badges of fraud") are present in this action and establish actual intent within the meaning of Section 1304(a)(1) of DUFTA: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; and/or (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

178.    Peak commenced this action within one year after the transfer or obligation was or could reasonably have been discovered by Peak as detailed above. The information necessary to

discover the forgoing transfers was concealed and unavailable to Peak until it conducted post-judgment discovery in the Underlying Action.

179.    As a direct result of Defendants' violation of DUFTA, Peak has been damaged in the principal amount of $1,269,346.25, plus post-award interest at the rate of 7.5% per annum compounded annually from February 22, 2023, plus costs and attorneys' fees as provided by law.

180.    Peak is entitled to all relief available under Section 1307 of DUFTA.

**<u>COUNT 4</u>**
**(Constructive Fraudulent Transfers in Violation of 6 Del. Code § 1304)**

181.    Peak restates and realleges the allegations set forth in preceding paragraphs above, as if fully set forth herein.

182.    At all times relevant herein, Peak was and has been a creditor of BCI, within the meaning of DUFTA.

183.    At all times relevant herein, BCI was a debtor, within the meaning of DUFTA.

184.    At all times relevant herein, Phipps, BSG and its United States subsidiaries are affiliates and insiders of BCI, within the meaning of DUFTA.

185.    BCI made transfers to insiders and affiliates, including, without limitation, Phipps, BSGL, and shareholders, after Peak's claim arose, within the meaning of Section 1304(a)(2) of DUFTA without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

186.    The transfers, include, without limitation:

a.   the April 30, 2020 dividends issued by BCI and/or BSG;

    b.   the $16.4 million write off of BCI's intercompany receivable;

    c.   excessive and unreasonable officer compensation paid to Phipps;

    d.   excessive and unreasonable expenses that benefited Phipps and other insiders of BCI;

    e.   the $702,500 wire transfer to BSGL for the benefit of BSGL and Phipps; and

    f.   other transfers that are identified in response to Peak's post-judgment discovery in the underlying action against BCI and in discovery in this action.

187.    As a direct result of Defendants' violation of DUFTA, Peak has been damaged in the principal amount of $1,269,346.25, plus post-award interest at the rate of 7.5% per annum compounded annually from February 22, 2023, plus costs and attorneys' fees as provided by law.

188.    Peak is entitled to all relief available under Section 1307 of DUFTA.

## IV.  **JURY DEMAND**

189.    Pursuant to Rule 38, Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all claims set forth herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to answer and appear herein, and demands judgment against Defendants as follows:

1.   Avoiding and preserving all fraudulent transfers free and clear from any lien or other claimed interest of the Defendants;

2.   Directing that all fraudulent transfers be set aside;

3.   Recovering such fraudulent transfers or the value thereof in the amount of no less than the amount of the fraudulent transfers and/or the entire amount of the unsatisfied judgment obtained by Plaintiff;

4.   Awarding any other relief authorized by Tex. Bus. & Commerce Code, 24.001, *et. seq.*

and/or 6 Del. Code § 1301, *et seq*.;

5. Imposing a constructive trust on all assets and revenue wrongfully obtained by Defendants;

6. Awarding damages in an amount to be determined at trial;

7. Awarding exemplary/punitive damages in an amount to be determined at trial;

8. Awarding all other damages and/or relief permitted at law and in equity for the claims asserted herein;

9. Awarding prejudgment and post-judgment interest at the maximum legal rate permitted by law;

10. Awarding attorneys' fees at all levels of the legal process as provided by law;

11. Awarding Plaintiff's costs and disbursements; and

12. Awarding such other and further relief to which Plaintiff may be justly entitled.

Dated: April 5, 2024

Respectfully submitted,

Scott T. Staha
_____
Scott T. Staha
Texas Bar No. 00785032
HERMANN & HERMANN, PLLC
The Herrman Building
1201 Third Street
Corpus Christi, Texas 78404
(361) 883-7705
STStaha@herrmanandherrman.com
litigation@herrmanandherrman.com

/s/ Shawn M. Perry
Shawn M. Perry
Minn. Bar No. 185000
PERRY & PERRY, PLLP
West End Plaza, Suite 336
1660 Highway 100 South
Minneapolis, MN  55416
(952) 546-3845
shawn.perry@pppllp.com

***Attorneys for Plaintiff***